**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS DIVISION**

**UNITED STATES OF AMERICA,**

      **Plaintiff**

**-vs-**                                                            Case No. 2:09-cr-102-FtM-29DNF

**KRAIG WILLIAM KNIGHT,**

      **Defendant.**

_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

    This cause came on for consideration on the following motion filed herein:

| | |
|---|---|
| **MOTION:** | **MOTION TO SUPPRESS EVIDENCE (Doc. No. 15)** |
| **FILED:** | **January 12, 2010** |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

| | |
|---|---|
| **MOTION:** | **MOTION TO SUPPRESS RESULTS OF INTERROGATION (Doc. No. 16)** |
| **FILED:** | **January 12, 2010** |

**THEREON** it is **RECOMMENDED** that the motion be **DENIED**.

    The Defendant, Kraig Knight is requesting that the Court suppress the evidence derived from a vehicle stop that occurred on October 6, 2009, and suppress all statements made by the Defendant

after the invocation of his right to counsel. On January 25, 2010, the Government filed its Consolidated Response to Motion to Suppress Evidence and Motion to Suppress Results of Interrogation (Doc. 18). The Court allowed the parties until February 2, 2010 to file additional memoranda on the issue of voluntary intoxication. The Government filed a Memorandum on the Issue of Voluntary Intoxication and Waiver of *Miranda* Rights (Doc. 23) on January 23, 2010. The Defendant did not file a supplemental memorandum. The Defendant is charged in an Indictment (Doc. 1). In Count One, the Defendant is charged with knowingly and willfully by force, violence and intimidation taking money that belonged to the Royal Palm Bank from a bank employee and using a dangerous weapon in violation of 18 U.S.C. §§2113(a), 2113(d) and Section 2. In Count Two, the Defendant is charged with knowingly using, possessing and carrying a firearm in relation to a crime of violence in violation of 18 U.S.C. §§2113(a), 2113(d), 924(c)(1)(A)(ii), and Section 2. An evidentiary hearing was held on January 28, 2010.

**I. Evidence**

The Government presented the testimony of Deputy Paulette Ehlers, Detective Richard Zeltman, Lieutenant Shawn Ramsey, Deputy George Burnette, and Detective Paul Harvey from the Lee County Sheriff's Office. The Defendant presented the testimony of the Defendant, Kraig Knight. The Government introduced into evidence nine (9) exhibits, and played a portion of the audio recorded interview.

**A. Deputy Ehlers Testimony**

Deputy Ehlers testified that on October 6, 2009 at 11:12 a.m., she was on road patrol duty when she was dispatched to a silent alarm which was later changed to a robbery of the Royal Palm

Bank at 7040 Winkler Road. (Tr.[1] p. 7-8). She was in uniform in a marked patrol car. (Tr. p. 13). She heard over the radio that there was a white male wearing a white T-shirt, jeans, and a mask who robbed the bank and was last seen heading northbound on foot. (Tr. p. 10). A further description of the suspect over dispatch was he was five feet, eight inches, and a thin build and that there was only one person involved in the robbery. (Tr. p. 11, 18). A vehicle description was dispatched to Deputy Ehlers describing a red Volkswagen Beetle with a tan top that was seen leaving the area shortly after the robbery heading northbound on Winkler Road. (Tr. p. 10). The relationship between the suspect and the car was that the suspect was seen heading northbound on foot into the apartment complex and then after a relatively short period of time, the suspect vehicle was seen leaving that area heading northbound on Winkler Road. (Tr. p. 10-11). Her location was on McGregor Blvd. just south of Cypress Lake so she made a u-turn and proceeded to the scene. (Tr. p. 10). As she headed towards Winkler Road by taking Cypress Lake eastbound, she saw a vehicle heading westbound on Cypress Lake which matched the description from dispatch. (Tr. p. 11, 12). When she spotted the vehicle, she called into dispatch that she located a vehicle matching the description, and she made a u-turn to try to get behind the suspect vehicle. (Tr. p. 11). As she passed the vehicle, she did see a white male with a white T-shirt driving the suspect vehicle. (Tr. p. 12, 15). She saw only one person in the vehicle. (Tr. p. 18).

Deputy Ehlers described the vehicle she saw as a red Volkswagen Beetle with a tan soft convertible top. (Tr. p. 13). She testified that this type of car is not commonly seen on the road and she described it as a "bold vehicle.". (Tr. p. 13, 15). Deputy Ehlers made a u-turn at South Pointe

---

[1] "Tr." refers to the Transcript (Doc. 20) of the evidentiary hearing filed on January 29, 2010.

Blvd. and headed westbound on Cypress Lake. (Tr. p. 16). The suspect vehicle turned right onto McGregor heading northbound and Deputy Ehlers got in front of an unmarked vehicle driven by Detective Zeltman that was directly behind the suspect vehicle. (Tr. p. 16). Multiple Lee County Sheriff's officers were in the vicinity on their way to Deputy Ehler's location. (Tr. p. 17).

Deputy Ehlers turned on her lights to initiate a felony stop at the intersection of Camelot and McGregor. (Tr. p. 17-18). The suspect vehicle stopped and Deputy Ehler went on her PA system and stated, "'Show me your hands, hands out of the window.'" (Tr. p. 18). The driver put his hands out of the window and then other units arrived at the scene. (Tr. p. 18). The suspect appeared to be wearing a white T-shirt. (Tr. p. 19). Deputy Burnette approached the vehicle with his weapon drawn, and Deputy Ehlers was behind him. (Tr. p. 19). Deputy Burnette took the suspect out of his vehicle and placed him in the back of Deputy Burnette's vehicle.

The door to the suspect vehicle was open, and Deputy Ehlers saw a handgun on the floorboard of the driver's side, a black canvas bag on the passenger side, and what appeared to be a wig in the back of the passenger side. (Tr. p. 21). She saw these items from outside of the suspect vehicle and did not enter the vehicle. (Tr. p. 21).

On cross-examination, Deputy Ehlers testified that she completed a sworn affidavit on October 6, 2009, regarding the incident. (Tr. p. 32-33). Deputy Ehlers testified that the dispatch call included that after the robbery, the suspect was walking northbound to the apartment complex, and the suspect vehicle was seen leaving shortly thereafter. (Tr. p. 33). In Deputy Ehlers sworn affidavit, she stated, "[t]he vehicle that the suspect was seen leaving in was described as a red Volkswagen with tan top heading northbound on Winkler." (Tr. p. 34). Deputy Ehlers was unclear but thought that the original dispatch might have stated that the suspect was seen leaving in the red Volkswagen Beetle, and then

may have been updated with a correction that he was not seen in the vehicle. (Tr. p. 35). Deputy Ehlers testified that she did not know of any witness that could place the Defendant physically in the red Volkswagen Beetle. (Tr. p. 37, 38). When she stopped the suspect vehicle, it was her belief that the vehicle may have been involved in the robbery. (Tr. p. 38). She stopped the vehicle for a felony traffic stop. (Tr. p. 41). Her affidavit failed to include the information that when she passed the suspect vehicle, she saw a white male with a white T-shirt driving the vehicle. (Tr. p. 37).

Deputy Ehlers testified that if a vehicle was seen leaving a crime in close proximity and in a short time period after the crime, officers would stop that vehicle. (Tr. p. 46). The vehicle was seen in close proximity to the bank and to where the suspect was walking. (Tr. p. 46). Even if multiple vehicles were seen leaving the area in proximity to the crime, the officers would attempt to stop these vehicles.

### B. Detective Zeltman's Testimony

Detective Zeltman testified that on October 6, 2009, he was on duty in an unmarked car on his way to lunch when he heard a call over the radio at approximately 11:12.a.m. concerning a robbery at the Royal Palm Bank. (Tr. p. 51) He was heading northbound on McGregor approaching Cypress Lake Drive. (Tr. p. 51). He turned onto Cypress Lake Drive heading toward South Pointe Boulevard, when he observed a red Volkswagon with a tan top heading westbound. (Tr. p. 51-52). The suspect vehicle was seen leaving the scene of the robbery at the time of the bank robbery. (Tr. p. 52-53). He recalled the dispatch information was that the suspect was a single male. (Tr. p. 53). He saw a red Volkswagen with a tan top coming toward him on Cypress Lake. (Tr. p. 53). He made a u-turn at South Pointe and headed back toward Cypress Lake maneuvering to get directly behind the suspect vehicle. (tr. p. 53-54). He saw one white or Hispanic male in the vehicle. (T. p. 54). Detective

Zeltman followed the suspect vehicle, and got on the radio to provide dispatch with the license plate number of the vehicle and information as to the direction the vehicle was traveling. (Tr. p. 55). Detective Zeltman saw a patrol car passing him in the westbound lane, and then realized that the patrol car had turned around and was directly behind him. (Tr. p. 55-56). His indications that the suspect vehicle was involved in the bank robbery were based on the direction the vehicle was traveling, the description of the vehicle, the male occupant of the vehicle, and the short time frame. (Tr. p. 56). Detective Zeltman allowed the marked vehicle to move ahead of him and get behind the suspect vehicle. (Tr. p. 58). The marked unit then initiated the traffic stop and Detective Zeltman turned on his lights as well. (Tr. p. 59). Detective Zeltman stepped out of his car and drew his weapon, focusing on the driver of the suspect vehicle. (Tr. p. 59). He heard the deputy on the radio telling the suspect to put his hands where they could be seen, and he saw the driver put up his hands. (Tr. p. 59). Additional units arrived. (Tr. p. 60).

On cross-examination Detective Zeltman testified that no one saw the Defendant physically get into the red Volkswagon Beetle with tan top. (Tr. p. 60-61). Deputy Zeltman followed the suspect vehicle because it was leaving the area of the bank robbery in near proximity to the time of the robbery. (Tr. p. 62).

**C. Lieutenant Ramsey's Testimony**

Lt. Ramsey responded to the traffic stop on October 6, 2009, because the Robbery Unit is one of the areas that he supervises. (Tr. p. 67). A red Volkswagen with a tan top was stopped on McGregor. (Tr. p. 68). He talked to the deputies on the scene and learned that the traffic stop was the result of a report bank robbery and that a white male was in the rear of a patrol car. (Tr. p. 69). Lt. Ramsey asked Deputy Burnette to assist him by standing next to him when Lt. Ramsey made contact

with the suspect. (Tr.p. 69). He asked Deputy Burnette to be present for testimonial purposes. (Tr. p. 70). Lt. Ramsey opened the door of the patrol car, identified himself, and gave the Defendant his *Miranda* rights from a pre-printed card. (Tr. p. 70-71). The Defendant stated that he understood his rights. (Tr. p. 71). Lt. Ramsey engaged in a casual conversation with the Defendant and told him the reason for the traffic stop was that his vehicle matched the description of a vehicle used in a bank robbery, and that he was told by deputies that the vehicle contained a firearm and mask. (Tr. p. 70-71). The Defendant acknowledged the mask and firearm. (Tr. p. 70, 71, 72). Lt. Ramsey told that Defendant that no one was hurt and that they would work through the rest of it at his office. (Tr. p. 72). The Defendant explained that his intentions were never to hurt anyone. (Tr. p. 72). The Defendant also made the statement that "the woman did not even see the gun" because it was in his waist and covered by his shirt. (Tr. p. 73). The statements about the gun were not in Lt. Ramsey's sworn statement. (Tr. p. 74). The Defendant was cooperative, did not appear under the influence of narcotics or controlled substances, and never invoked any of his *Miranda* rights. (Tr. p. 74). The Defendant was transported to the major Crimes Unit Office in Deputy Burnette's patrol car. (Tr. p. 75).

At the major Crimes Unit, the Defendant was placed in a holding cell. (Tr. p. 75). The Defendant asked to smoke a cigarette, and Lt. Ramsey allowed him the opportunity to smoke a cigarette. (Tr. p. 75). He removed the Defendant's hand restraints and leg shackles. (Tr. p. 75). Lt. Ramsey and Deputy Burnette escorted the Defendant outside. (Tr. p. 76). Lt. Ramsey reminded the Defendant of his rights, and they had a brief conversation. (Tr. p. 76). The Defendant told Lt. Ramsey about his hard economic times, that he had no intentions of harming anyone. (Tr. p. 76). His electric or phone had been shut off, and this was the last straw before he went and committed the robbery. (Tr.

p. 76). The Defendant reiterated how the gun was in his waistband and that his shirt covered it so that he did not believe the teller was aware of it. (Tr. p. 76). The Defendant never invoked his *Miranda* rights during this conversation. (Tr. p. 76). No officer pressured or threatened the Defendant into making these statements, and no officers made any promises to the Defendant. (Tr. p. 77). The Defendant appeared to be above average intelligence based upon him running his own business. (Tr. p. 77). The Defendant was returned to the holding cell. (Tr. p. 79). Lt. Ramsey did mention to Detective Harvey after Detective Harvey took the Defendant's formal statement that the Defendant admitted to bringing a gun into the bank. (Tr. p. 89).

Lt. Ramsey was sure that no recorded statements were taken of the Defendant prior to the cigarette break because Detective Harvey was not at the Major Crimes Unit prior to the cigarette break. (Tr. p. 161). The Defendant did not invoke his right to counsel prior to the cigarette break discussion. (Tr. p. 161-2). Lt. Ramsey never told the Defendant that it was better if he did not talk to an attorney, and the Defendant never told him that he was addicted to any narcotic drugs. (Tr. p. 162). The Defendant did not appear to be under the influence of any drugs. (Tr. p. 162). The cigarette break lasted about ten minutes. (Tr p. 162).

### D. Deputy George Burnette

Deputy Burnette works for the Selective Enforcement Team which involves narcotics enforcement and fugitive apprehension and he is the community policing officer for Pine Manner. (Tr. p. 95). Deputy Burnette was on duty on October 6, 2009, in uniform and in an unmarked patrol car. (Tr. p. 95). He heard a call that a bank robbery had just taken place and decided to respond to the call. (Tr. p. 95). He heard that the suspect vehicle was a red Volkswagen Beetle, and the suspect was wearing a white T-shirt and blue jeans. (Tr. p. 96). Deputy Burnette heard Deputy Ehlers radio

announcement that the suspect vehicle was traveling on Cypress Lake Drive and Deputy Burnette started traveling towards that direction. (Tr. p. 96). He heard over the radio that officers had initiated the traffic stop, and he arrived at the scene a few seconds after the stop was made. (Tr. p. 97). He got out of his vehicle, and walked to the driver's side of the suspect vehicle with his gun drawn and told the driver to take off his seatbelt, open the door, get out of the car, and move to the back of the car. (Tr. p. 98). Deputy Burnette placed handcuffs on the Defendant and patted him down. (Tr. p. 98). Deputy Burnette asked the Defendant for his name and date of birth. (Tr. p. 98). While Deputy Burnette was verifying the Defendant's information, the Defendant made a spontaneous statement that he was in the area to measure the reflective coating on roofs for an FPL rebate, and he thought he was pulled over for a problem with his license plate. (Tr. p. 101).

Lt. Ramsey asked Deputy Burnette to accompany him. (Tr. p. 99). Lt. Ramsey approached Deputy Burnette's patrol car and introduced himself to the Defendant and advised the Defendant of his *Miranda* rights. (Tr. p. 99). He heard the Defendant state that he understood his *Miranda* rights and Deputy Burnette never heard the Defendant invoke his rights. (Tr. p. 100). After the *Miranda* rights were given, Deputy Burnette walked to the back of the patrol car and could hear Lt. Ramsey's statements and questions to the Defendant, but could not hear the Defendant's responses. (Tr. p. 100, 102). Deputy Burnette transported the Defendant to the Major Crimes Unit. (Tr. p. 103).

At the Major Crimes Unit, Deputy Burnette walked the Defendant towards an interview room. (Tr. p. 103). The Defendant requested to be allowed to smoke a cigarette. (Tr. p. 104). Deputy Burnette, Lt. Ramsey, and the Defendant went outside to smoke. (Tr. p. 104). Lt. Ramsey reminded the Defendant of his *Miranda* rights and asked if he understood them which the Defendant indicated he did. (Tr. p. 104). A conversation ensued, and the Defendant told of his extreme financial

hardships, and then Lt. Ramsey asked the Defendant if the gun was loaded. (Tr. p. 105). The Defendant said the gun was not loaded and the safety was on. (Tr. p.105). The Defendant added that he did not think the teller saw the gun because it was in his waistband and his shirt was covering the gun. (Tr. p. 105). The Defendant did not invoke his *Miranda* rights. (Tr. p. 105-106).

On cross-examination, Deputy Burnette testified that it was his understanding that a red Volkswagen was involved in the bank robbery. (Tr. p. 110). Deputy Burnette did not know if someone had actually seen the suspect get into the vehicle. (Tr. p. 110). Deputy Burnette completed his sworn statement prior to leaving the Major Crimes Unit. (Tr. p. 113). Deputy Burnette remembered that Lt. Ramsey gave the Defendant his *Miranda* rights from memory and not from a card. (Tr. p. 113).

The Defendant stayed with Deputy Burnette or was in the holding cell prior to the cigarette incident. (Tr. p. 165). Detective Harvey was not with the Defendant, and the recorded statements were done after the cigarette break. (Tr. p. 165).

**E. Detective Paul Harvey's Testimony**

Detective Harvey was on duty on October 6, 2009 as a detective for the Major Crimes Unit. (Tr. p. 116). He learned that a bank robbery has occurred at the Royal Palm Bank on Winkler Road. (Tr. p. 116). He was the lead detective. (Tr. p. 116). Detective Harvey obtained witness statements at the bank, he interviewed the Defendant, and prepared a search warrant affidavit for the search of the Defendant's vehicle. (Tr. p. 117). Detective Harvey conducted a recorded interview with the Defendant. (Tr. p. 120-121). Lt. Ramsey told Detective Harvey prior to the interview that he had read the Defendant his *Miranda* rights, and that the Defendant said he had a firearm when he was in the bank. (Tr. p. 120-122). Lt. Ramsey also said that the Defendant was cooperative and had spoken to

him. (Tr. p. 122). Detective Harvey read the Defendant his *Miranda* rights (Tr. p. 121). The Defendant was also provided a written *Miranda* form. (Tr. p. 112, Gov. Exh. 8). The Defendant made two recorded statements. (Tr. p. 123, Gov. Exh. 9). The Government introduced the recordings and transcriptions of the two statements. (Tr. p. 124, Gov. Exh. 9, 10, 11).

When Detective Harvey gave the Defendant his *Miranda* rights, the Defendant stated that he wanted to speak to his attorney, Bob Burandt. (Tr. p. 125). Detective Harvey concluded the statement at approximately 1:55 p.m. and left the room. (Tr. p. 125-126). Detective Harvey told Lt. Ramsey who was standing outside of the interview room that the Defendant invoked his right to counsel. (Tr. p. 126). At that point, the door to the interview room opened and the Defendant asked Detective Harvey to come back into the room to speak with him. (Tr. p. 126). Detective Harvey re-entered the room and began recording a second statement at approximately 1:58 p.m.

> The following is a portion of the second recorded statement:
>
> Harvey: Okay. Um, Kraig, you – I just gave a state – or just read you your rights, and you asked for an attorney. Is that correct?
>
> Defendant: Yes.
>
> Harvey: Okay. did you – you wanted to – you re-initiated contact with me; is that correct?
>
> Defendant: Yes.
>
> Harvey: Okay. And what – what do you want from me?
>
> Defendant: I basically, uh, wanna tell you what happened and, uh, hopefully can get this resolved so I can go home as soon as possible today to see my family, so my children are not as distraught as they're gonna be once the rest of it comes out.
>
> Harvey: Okay. Did I in any shape – way, shape or form make you come to that decision?
>
> Defendant: No.

> Harvey: To re-initiate contact with me?
>
> Defendant: No
>
> Harvey: Okay. And you did that on your own free will?
>
> Defendant: Yep.
>
> Harvey: Okay. All right Kraig. And the rights that I read to you, you understood them; is that correct?
>
> Defendant: Correct.
>
> Harvey: And you do not want an attorney at this time?
>
> Defendant: No.

(Gov. Exh. 11, p. 1-2). At the end of the second recorded statement, the following occurred:

> Harvey: – mistreated you in any way?
>
> Defendant: Does it – no.
>
> Harvey: Okay. And do you – did you, uh make this statement all on your own free will?
>
> Defendant: Yep.
>
> Harvey: Okay. And did I threaten you or – or promise you a steak dinner, to make this, uh, you know, any – any make any promises--
>
> Defendant: No
>
> Harvey: – or threats, to make you make this statement?
>
> Defendant: No. I did – I – I do feel like, uh, by talking to you instead of tryin' to get my attorney, it would go easier, as far as involving and getting the headache of having the attorney involved; if I tried to lay everything out on the line and be honest with you, that you could see the – the reality of my situation, and that might make things easier on me.
>
> Harvey: And you – and you made the decision on your own?

Defendant: Yeah.

(Gov. Exh. 11, p. 9).

In the second statement, the Defendant stated that he did not take the gun into the bank. (Tr. p. 131). Detective Harvey knew that the statement was inconsistent with the Defendant's statement to Lt. Ramsey. (Tr. p. 132). Detective Harvey chose not to confront the Defendant because he did not want to press the issue and than have the Defendant "shut down." (Tr. p. 132).

On cross-examination, Detective Harvey testified that he had no special training for people who are impaired by drugs or alcohol other than at the police academy. (Tr. p. 133-134). Detective Harvey found the Defendant to be upset, but did not appear to be under the influence of any medications, legal or illegal. (Tr. p. 134). The Defendant never told Detective Harvey that he was under the influence of drugs or alcohol and Detective Harvey was not aware of whether the Defendant was addicted to narcotics. (Tr. p. 134). In the first recorded statement, the Defendant stated: "Yep. Here again, should I be talking to my attorney?" (Gov. Exh. 10, p. 2). Detective Harvey testified that to his knowledge, the Defendant never invoked his right to counsel prior to his first recorded statement. (Tr. p. 135-136). The Defendant stayed in the interview room after the first statement and before the second statement began. (Tr. p. 167). Detective Harvey executed the search warrant for the suspect vehicle and seized a black leather wallet, a Halloween mask, a nylon black attache case, $4,159.00 in U.S. currency, a semi-automatic handgun, one magazine with 9 mm ammunition, and a black holder with an additional magazine loaded with 9mm ammunition. (Tr. p. 118-120).

**F. Kraig Knight's Testimony**

The Defendant testified on the date of his arrest he was under the influence of Oxycontin and Xanax. (Tr p. 141). The Defendant made this known to either Lt. Ramsey or Detective Harvey that

he was addicted to these pills. (Tr. p. 141-142). The Defendant testified that the medication affected his ability to make correct decisions, and he was not in his normal right state of mind and was not clear in his thinking. (Tr. p. 142, 151). He believed he was coherent when he answered the officers' questions, but not "clear or as vibrant as I normally am." (Tr. p. 143).

      The Defendant stated that Lt. Ramsey introduced himself at the stop but never gave him his *Miranda* rights. (Tr. p. 144). The first time he was given his *Miranda* rights was at the Major Crimes Unit. (Tr. p. 144). At the Major Crimes Unit, they put him in a holding cell and he asked to have a cigarette. (Tr. p. 144). He waited and then Detective Harvey case into the room and they started the interview. (Tr. p. 144). Detective Harvey read him his rights and the Defendant asked for an attorney. (Tr. p. 144). Detective Harvey left the room, and the Defendant called to him, asking if he could have a cigarette. (Tr. p. 145). His handcuffs were removed and he went outside to smoke a cigarette with Lt. Ramsey. (Tr. p. 145). The Defendant asked Lt. Ramsey how to expedite matters, and Lt. Ramsey told him by asking for an attorney, that would delay things. (Tr. p. 145). Lt. Ramsey asked him some questions about what happened in his life. (Tr. p. 146). Lt. Ramsey directed some questions to the Defendant about the bank robbery and if the Defendant had a gun. (Tr. p. 147). The Defendant admitted to having a gun. (Tr. p. 147). Lt. Ramsey had convinced the Defendant to talk to Detective Harvey, and so he agreed to reinitiate a statement. (Tr. p. 147). The Defendant was worried that he needed an attorney. (Tr. p. 149-151).

      On cross-examination, the Defendant testified that his memory of the events was good and that he was not impaired that much from his drug use. (Tr.p. 155). He was able to drive on the date of the bank robbery. (Tr. p. 155). His memory was accurate as to the day of the incident. (Tr. p. 155). The Defendant understood what the officers were saying to him. (Tr. p. 158).

## II. Analysis

The Defendant argues that no reasonable suspicion existed for the officers to stop the car and that the statements made after the Defendant invoked his right to counsel should be suppressed. The issue of whether the Defendant was under the influence of narcotics and therefore, that the statements made were not voluntary was raised at the evidentiary hearing.

### A. Stop

The Defendant asserts that the traffic stop was not based upon any reasonable, articulable suspicion that the Defendant was engaged in criminal activity, and therefore, the stop was unlawful. The Fourth Amendment provides protections to individuals from unreasonable searches and seizures by government officials, and this protection extends to investigatory stops of people or vehicles. *United States v. Johnson*, 192 Fed.Appx. 935, 938 (11th Cir. 2006), (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Officers "may not conduct random suspicionless stops of vehicles." *United States v. Phillips*, 327 Fed.Appx. 855, 857 (11th Cir. 2009). A stop of an automobile by police, even if only for a brief period of time and for a limited purpose constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment. *Whren v. United States*, 517 U.S. 806, 809-810 (1996), citations omitted. A traffic stop must not be "unreasonable" under the circumstances. *Id*. at 810. The Fourth Amendment strikes a balance between the public interest and an individual's right to personal security, and "is satisfied if the officer's action is supported by reasonable suspicion to believe that criminal activity 'may be afoot.'" *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

A court must consider the "'totality of the circumstances'" when deciding each case and determining whether the officer had a "'particularized and objective basis' for suspecting legal wrongdoing." *Id*. (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). An officer is permitted to stop a vehicle and briefly detain a person "'in order to investigate a reasonable suspicion that such persons are involved in criminal activity.'" *United States v. Phillips*, 327 Fed.Appx. 855, 857 (11th Cir. 2009) (citing *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990) (citing *Terry v. Ohio*, 392 U.S. 1 (1968)).

An officer may rely on his own experience and specialized training to determine whether there is a likelihood of criminal activity. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). An officer must be able to point to "'specific and articulable facts which taken together with rational inferences from those facts, reasonably warrant that intrusion.'" *United States v. Phillips*, 327 Fed.Appx. 855, 857 (11th Cir. 2009). However, officers are not permitted to rely on a mere "'hunch'" to justify a stop. *Arvizu*, 534 U.S. at 274. The likelihood of criminal activity does not need to rise to the level of probable cause and "falls considerably short of satisfying a preponderance of the evidence standard." *Id*. (citing *Sokolow*, *supra* at 7).

The Defendant argues that the only information that Deputy Ehlers had was that a red Volkswagon Beetle with a tan top left the area near the robbery near the time of the robbery. However, Deputy Ehlers had more information. The dispatch information was that a white male wearing a white T-shirt and jeans and was five feet, eight inches tall with a thin build had robbed the bank. There was only one person involved in the robbery. A red Volkswagon Beetle with a tan top was seen leaving the area shortly after the robbery and was seen heading northbound on Winkler Road. The suspect was seen leaving the bank on foot heading northbound into the apartment complex

shortly before a red Volkswagon Beetle with a tan top was seen leaving that area. Deputy Ehler testified that when she saw the red Volkswagon Beetle with a tan top, she saw that the driver was a white male wearing a white T-shirt. This occurred in close proximity and time to the robbery and was consistent with a red Volkswagon Beetle heading north on Winker. Based on the totality of the circumstances, Deputy Ehlers had specific articulable facts that there was a likelihood and a reasonable suspicion that the occupant of the red Volkswagon Beetle with a tan top was involved in criminal activity. Therefore, the results of the stop of the vehicle should not be suppressed including the evidence seized and all statements made by the Defendant.

### B. Voluntariness of Statements Due to Narcotics

The Court recognizes that there is a discrepancy in the testimony as to the timing of the statements and as to whether the Defendant told the officers that he was addicted to narcotics. At the evidentiary hearing, the Defendant testified that he was addicted to narcotics, specifically Oxycontin and Xanax and that he had taken some drugs that morning. The Court had a concern that based on this testimony that there was an issue as to the voluntariness of the waiver of *Miranda* rights. In its supplemental Memorandum (Doc. 23), the Government objected to the issue being raised since it was not raised in the Defendant's Motions. Although not entirely clear at the hearing, the Defendant testified that he did remember clearly the incident and his statements.

"[T]he fact that a defendant suffers a mental disability, whether drug-induced or otherwise, does not alone render a waiver involuntary; instead, there must be coercion by an official actor." *United States v. Jackson*, 2008 WL 5155656, *4 (S.D. Fla. Dec. 5, 2008) (citing *United States v. Barbour*, 70 F.3d 580, 585 (11th Cir. 1995) (citing *Colorado v. Connelly,* 479 U.S. 157, 169-70

(1986)). The second requirement of a waiver is that the waiver was made with "'a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.'" *Id*. (quoting *Barbour*, 70 F.3d at 585). A drug induced impairment may prevent a suspect from understanding the nature of his waiver. *Id*.

In the instant case, the Court listened to the audio recordings of the Defendant's statements. The Defendant was coherent and able to answer the questions asked and the responses were appropriate. Lt. Ramsey and Detective Harvey both testified that the Defendant did not appear to be under the influence of any medications and that the Defendant never told them that he was under the influence of medications. The Defendant testified that he was not so impaired that he was not able to drive, and not so impaired that he was unable to remember the events that occurred. There was no testimony or evidence presented that the Defendant was forced, threatened or coerced in any manner by the officers, and the Defendant was permitted to smoke a cigarette. The Court finds that the waiver of his rights was voluntary.

The Court finds no evidence that the Defendant did not understand the nature and consequences of his decision to waive his *Miranda* rights. As evidenced by his invocation of his right to counsel, the Defendant understood that he could invoke his rights. Therefore, the Court finds that the Defendant's waiver of his *Miranda* rights was voluntary and the Defendant understood the nature and consequences of his decision.

### C. Invocation of Right to Counsel

The Defendant argues that he invoked his right to counsel and did not intend to revoke his invocation of that right, but was coerced into his revocation. A suspect is entitled to consult with an

attorney and have an attorney present when he is subject to a custodial interrogation. *Davis v. United States*, 512 U.S. 452, 457 (1994). If a suspect requests counsel at any time during an interrogation, all questioning must stop until an attorney is made available to him or "the suspect himself reinitiates conversation." *Davis v. United States*, 512 U.S. 452, 458 (1994) (citing *Edwards v. Arizona*, 451 U.S. 477, 484-485 (1981)), *See also, United States v. Bing*, 2009 WL 179531,*4 (M.D. Fla. Jan. 23, 2009). It is uncontested that the Defendant invoked his right to counsel at the first recorded statement. The time between the first statement and the second statement was a few minutes. Detective Harvey testified that after the first statement he left the interrogation room, and was standing outside of the room when the Defendant opened the door of the interrogation room and asked the Detective Harvey return because he wanted to make a statement. At the beginning of the second statement, Detective Harvey asked the Defendant if he wanted to reinitiate contact, what he wanted from Detective Harvey, and if Detective Harvey had forced him to reinitiate contact. The Defendant responded yes to wanting to reinitiate contact, that he wanted to help resolve the situation so that he could return to his family, and that Detective Harvey had not forced him to reinitiate. He responded "yep" to the question that he reinitiated contact of his own free will. Detective Harvey also asked if the Defendant wanted counsel and the Defendant responded no. From the testimony and from the recorded statement, the Defendant did reinitiate contact of his own free will. Therefore, the Court finds that the statements made by the Defendant after his invocation of his right to counsel should not be suppressed.

**III. Conclusion**

The Court finds that the stop of the Defendant's vehicle was lawful and that the evidence seized and the statements made by the Defendant should not be suppressed. Therefore, the Court

respectfully recommends that the Motion to Suppress Evidence (Doc. 15) be denied and the Motion to Suppress Results of Interrogation (Doc. 16) be denied.

Failure to file written objections to the proposed findings and recommendations contained in this report within fourteen (14) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

Respectfully recommended in Chambers in Ft. Myers, Florida this __4th__ day of February, 2010.

_____
DOUGLAS N. FRAZIER
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record